S&M Brands, Inc. v. State of Georgia Mr. Browning. May it please the Court, Chris Browning representing the appellant, S&M Brands, with me at counsel table is Brian Haynes, my law firm, as well as Everett G., General Counsel of S&M Brands. For almost two decades, S&M Brands has had the right under its escrow agreement to invest its escrow account in 30-year U.S. Treasury bonds, an asset which is universally recognized as being one of the most stable and secure in the country. Since World War II, when Americans viewed it as their patriotic obligation to invest in this country, the U.S. government obligations have stood as the investment that has held its value through domestic and global economic conditions. In fact, Georgia has expressly declared that, quote, obligations of the United States government are not considered to have credit risk and do not require the disclosure of credit quality. S&M Brands' right to have its escrow account invested in 30-year Treasury bonds is a material financial term of a contract that preexisted the investment restriction. So maybe you could explain the materiality a little better than appears in the briefs because as we all know, the restriction, the change that was made limited S&M Brands to 20-year bonds and also grandfathered in the 30-year bonds. And there's no quantification of what the damage is to S&M Brands. So when I read the briefs, I'm thinking to myself, well, S&M Brands is saying we made a calculated decision to come into Georgia anticipating that this would be our liability to the escrow fund versus our revenues. And now something's changed, but we have no idea how material that impact is from what's been presented. Yes, Your Honor, and the materiality of that impact is something to be resolved through discovery through, you know, at the pleading stage. We believe it would be inappropriate to dismiss this case or the district court erred because it dismissed this case when there are clear allegations that this impacts the profitability of the company, when there are allegations that the only reason the state of Georgia is doing this is not because they have any concern about the U.S. government going bankrupt. Then we should take your word for it that it's a material impact at the 12B6 stage. Yes, Your Honor, it is. I think our allegations and complaints... Well, let's assume that's the case. It's clear that there's only one objective here, at least I think there's only one, and that's to keep a level playing field. The state wants to keep a level playing field between the PMs and your clients. Well, Your Honor... I mean, that's the objective. Is it not? Your Honor, that is what the state would say. I understand. I mean, that was basically the policy that underpinned the whole thing was a level playing field. Was it not? With this clarification, Your Honor, that the level playing field is that the participating manufacturers gave up their First Amendment rights and they... We understand that. They were far limited by the settlement, more so than you were. Correct. And we are being punished for exercising our First Amendment rights. Well, be it that, but basically, if you get it to the bottom, it's to keep a level playing field, isn't it? And so they make a change because they think you've got the upper hand in the level. Your Honor, we would submit... They're using the old contractor's level. Your Honor, we would submit that the master settlement agreement is not a level playing field. The major... No, no, not the master one. What they're trying to do is to make the competition even. And Judge Schoflat, because the master settlement agreement is due to benefit participating manufacturers, the implementation of these investment restrictions are attempting to neutralize and penalize us for exercising our First Amendment rights. What is the First Amendment... Oops, sorry. Go ahead. You go ahead. What exactly is the First Amendment right that you have been precluded from exercising? Your Honor, we have the right to engage in commercial speech, which we... What is the commercial speech that you've been precluded from exercising? Well, for example, we have engaged in what would be considered billboards, placements of ads on vehicles. In the past, we have engaged in sponsorship of... How are you kept from doing that? Your Honor, it's not that we are being kept from doing that. It is that the state of Georgia has a strong incentive to penalize us for... What you're saying is that your operating costs have gone up, so your speech has gone down. Is that about the size of it? Our operating costs have gone up for no good reason, for no... I understand that. And that's impinged on your advertising. Yes, Your Honor. Okay. Well, aren't we... Because we have... I'm not trying to argue against you. I'm just trying to understand. Yeah. And let me... Am I wrong in the idea that how inept it might have been implemented? The idea was to keep a level playing field. No, Your Honor. It was not the idea. What the Master Settlement Agreement does is these companies had engaged in numerous misconduct, as the states allege, things like advertising to children. Well, I understand that, but after that settlement agreement is done and they're permitted to operate, wasn't the idea to keep a level playing field as a cost of doing business? Or am I missing the point? The only way to keep that level playing field is to take away our right to engage in commercial speech or to penalize us, to impose additional cost on us because our commercial speech allows us to cut into their market share, and that creates an incentive to ratchet up the cost on us, and that is exactly what these investments... That impinges on your advertising funds. It makes... It neutralizes the effect of advertising. You can do the same things you were doing before they made the change, but it's uneconomical. Is that what you're arguing? No, we're saying that every time we advertise, the state beats us with a stick, that they ratchet up the cost of doing business because they cannot afford to have... But the intent, though, is to keep you from advertising like you were doing before. Or is it to coerce you into becoming something other than an NPM in relationship to the master settlement? Obviously, the state would like NPMs to go away. Obviously, they have penalized... Will there be more money for the state? Yes, Your Honor, which when you go through all of the... I mean, that was the old idea of going way, way back. I mean, that's the real issue here is when you go to the contract clause cases, the financial interest of the sovereign is not of legitimate public purpose. So we have had these contracts in place. We have had the right to invest. The state wants to penalize us so we don't eat into their market share, so that we don't use advertising to gain into their market share. And they come up with a scheme to make it more costly for us. And that scheme is to say, the strongest investment in the world you can no longer hold, even though the state of Georgia has said 30-year U.S. Treasury bonds pose no credit risk, that they are a stable and sound investment. But that's also only part of their justification. Their other justification was that they're not as liquid as, say, 20-year bonds or other investments. Well, they're... But these are assets that are bought and sold at the, you know, readily, that they... But that is part of their other rationale, is it not? Well, that's not a legitimate rationale. The same applies to the other assets, which are money market accounts and other investment vehicles. So it's no different than anything else in our portfolio, other than cash. And of course, the state, if they're allowed to take away our ability to invest in this, they'll say, all you can hold is cash. Let's look at what the state's doing and call it a tax. Your Honor... Let's just call it a tax. How much money are they taking from you under the new arrangement? Under the escrow, it's basically... How much money is it costing you so that you can't advertise and do these other things, so you can't compete? How much have they added to your burden? I'll put it that way. Whether you call it a tax burden or a license burden or whatever it is, to do business. It is 3.3 cents per cigarette, which is in excess of what the... I saw that in the complaint, but what's that add up to? Your Honor, that is proprietary information and something that the company doesn't share with the attorneys arguing in the 11th Circuit. But how do we know you've been injured? Your argument is you have less money now. And Your Honor... Is that not the point? Let me clarify the point. It's not that we don't have money to advertise. It's that every time we try to advertise and the fact that we have gained market share because advertising causes them to ratchet up things... Well, they just said they only ratcheted one time, wasn't it? Your Honor, there have been... Are they going to do it one more time? That is the only issue that's before the court in this complaint. Well, there's one in this case, Your Honor. Okay. But how do we know it's not de minimis? Your Honor, the allegations... From the allegation. Yeah. The allegations of the complaint make very clear that this has impacted the profitability of the company, that we have been penalized as a result of this. Are you saying that it's a trade secret to tell us how much it's impacted? Your Honor, I do not know the dollar amount in terms of how much we pay into escrow each year, but it is substantial. No, how much more are you paying in or whatever it is that you didn't before or not taking out, whatever? Your Honor, as alleged, the fact that or as set out in our arguments, to the extent that we can no longer invest in 30-year bonds, that will cost us hundreds of thousands of dollars. And that's the penalty we suffered. All right. You say, but... Thank you, Your Honor. Mr. Perch. Thank you, Your Honor. May it please the court, Forrest Pierce here from the Attorney General's Office seated with me at counsel's table is Robin Cohen, Senior Assistant Attorney General. The district court was correct to dismiss S&M's complaint. Tobacco companies like S&M have been challenging escrow requirements basically since the escrow statutes were enacted about 20 years ago. So I want to contribute a little confusion to this. All right. So I'm a little, and I am a little confused. There's the master settlement agreement. It's a national agreement. It had a model escrow agreement and model escrow statute attached to it. And there are provisions in there for changing the model escrow statute and agreement. So I'm really confused and don't understand how Georgia, standing alone, has the authority to make a change to the statute or regulations governing the escrows. And why the provisions in the master settlement agreement that address whether or not a qualifying statute is in fact a qualifying statute don't kick in here to have a binding determination made by what's called the firm in the master settlement agreement determine whether or not the change that Georgia is proposing to make somehow makes this not a qualifying statute. Do you have any idea what I'm talking about? I think I do, Your Honor. So the way that the master settlement agreement works is the states are required, well, I shouldn't say required. They have an incentive to enact an escrow statute, a qualifying statute. And there is a model in the MSA. That's not binding on these parties. That's correct, Your Honor. Because they're not signatories. That's correct. And the state passes the qualifying escrow statute and as long as it enforces that qualifying statute, then what's called the NPM adjustment, which is where the independent auditor decides whether the participating manufacturers under the MSA have lost market share as a result of the provisions of the agreement, if they decide that, there can be an adjustment to the PM's payments. But that adjustment doesn't apply to any state that has diligently enforced the qualifying statute. But as to your question about whether Georgia has the authority to enact additional restrictions or change the statute, the MSA doesn't restrict Georgia's, the power of the Georgia General Assembly to legislate as to companies that haven't signed the MSA. It just sets the floor. Well, if it did, it would have an effect on the PMs and not these clients. I'm sorry, Your Honor, I don't understand the point. If there had been a restriction in the master settlement agreement about the power of the state to amend the qualifying statute or whatever, the model, that would be something that the PMs bargained for or didn't bargain for, whatever the case. That's correct. And if it was inappropriate, I'm not arguing it, in case I'm trying to understand by talking out loud here. So if the state changed the statute, if somebody had agreements, it would be the PMs. If the state were to... The PMs might say, you're not taking enough money from the NPMs. The PMs might theoretically take the position that Georgia is not... It would be like the state not enforcing the quality statute at all. Correct. If Georgia were not enforcing a qualifying statute at all, then the PMs would say, and there had been a market share loss to the PMs. Or if Georgia changed the statute so as to lessen the, cut down on the model, they could have an argument. Well, we could have an argument at that point about whether it's... The PMs. The PMs could have an argument at that point about whether it's a qualifying statute. The MSA sets forth a model. So with regard to these, the non-PMs, it doesn't make any difference about the statute. Georgia can do whatever it wants, as I understand it. There's no agreement. There's nothing that prevents Georgia from exercising the police power. That's absolutely correct, Your Honor. Absolutely correct. But it's one national escrow agreement. So I'm having trouble understanding how Georgia makes a change to the escrow agreement. Each state has a separate escrow statute. Well, that I understand, but there's one escrow agreement and then there's sub-accounts for  That's correct. That's the way I understand it. So how does Georgia make a change to the escrow agreement when all there is is a national agreement with sub-accounts? Well, the national agreement is the MSA. Well, the escrow agreement is, it covers every, so in the case of S&M Brands, maybe I don't understand something correctly, but the way I understood it was S&M Brands has one escrow agent, that's SunTrust. It covers all this. There's one escrow agreement that covers all the states that S&M Brands does business in. Maybe S&M Brands only does business in Georgia? I don't think that's correct. To be honest, Your Honor, I don't know the answer to your question as far as what the impact of the revised model escrow agreement would be in other states. I mean, Georgia's position is this, in this case, is just that with regard to their deposits in Georgia, we have the ability to restrict the investment of their escrow fund. And so... I think your colleague wants to help you a little bit, so why don't you just take a moment to go over there and have a word. We call that a sidebar. So, the answer to your question, Your Honor, is that they can amend the agreement just with regards to their deposits for Georgia, and other states, some but not all, have amended their agreements in the past. And they can because, what is the, they can, okay, I mean, I'd love to be able to take your word for it. They can because, what is the authority for that? Well, it's their contract. I mean, they, as long as they're complying with the investment restrictions that the state has imposed and the other restrictions on the management of the escrow fund, you know, as long as they're regarding, complying with any specific state's minimum requirements, then I wouldn't see any problem with them changing the escrow agreement with regard to their deposits in that state. Okay. So the, if there are no further questions about the escrow agreements. Anything more to all this than just keeping a level playing field? Well, I don't, I, or am I losing something? I think what's going on here. If you squeezed this case down like a Turkish towel and there's not a drop of water in it, what's left? Keeping a level playing field. Well, the state has, the Georgia General Assembly has articulated very clearly what its policy is with regard to tobacco. Well, let's say when they started this off, the idea was a level playing field, wasn't it? Well, the idea was that when the states entered the master settlement. Look, you've got to have the PMs keep pouring indefinitely money into the states. Yes. That's right. And so you don't want the PMs to have a competitive advantage. I'm sorry. Is that not the case? That's correct. So we're talking about a level playing field so that the state protects the money that's coming in from the PMs. Well, I wouldn't describe it as protecting the money that's coming in from the PMs. Well, they need to have it. We'd like to have it, yes. They've got to, the legislature needs it and the lawyers need it. There are lawyers with contingent fees that you've got to slice every year. There are the NAG lawyers that administer the MSA, that's correct. And so the... What more is it than keeping a level playing field to ensure the continued flow of money from the PMs? Well, the purpose articulated by the Georgia General Assembly in the statute was to ensure that tobacco companies remain financially responsible for the harms... Well, you tell me what you think the purpose is. I think the purpose is... Am I off the base? Am I wrong? I'll put it that way. I think that you're giving a partial explanation of the purpose. Is it all about keeping a level playing field? That's all I want to know. I don't think it... I would say it's all about keeping a level playing field. Then there's something else and that troubles me then. What else is it? So the... We'll strike that as a purpose. Okay. So you tell me what the purpose is now. So the purpose is to ensure that tobacco companies remain financially responsible for the health care costs that their product creates. And Georgia has done that by entering a settlement with some companies and it requires other companies to deposit money into escrow so that if they are eventually found liable for the harm that we know their product is going to cause, that there will be money available to satisfy a judgment and that they won't be able to... The judgment brought... The case is brought by smokers? The case would be brought by the state. By the state. Okay. So if the state has brought a claim... How many claims has the state brought since the settlement? I'm not aware of any, Your Honor. We have not brought any against S&M. Do you know of any claims brought against the NPMs by states? I'm not aware of any release claims having been brought against the NPMs by the states. So this is just ethereal, really? Well I don't know if it's... You want more money because there might be some claims, is that it? It's... The concern is that we know that cigarettes are very harmful to citizens of the state and we know that they create great costs and we know that there is a good chance that the company selling a deadly product that makes a lot of costs might eventually be found liable. But the concern is that... Well, liable to the state. Liable to the state, that's correct. Under what theory? Is there a cause... Nobody's filed a lawsuit against them. Well nobody's filed a lawsuit against... yet, but what the statute says and what the statute notes is that sometimes it can take a while between the time when the product is sold and when liability accrues. So now what we have is we have an industry that may cause injury to people in the state. Correct. Forget cigarettes. Not may cause, it will cause. Forget cigarettes. Okay. And you want the industry, as a condition to doing business in the state, to give a deposit to the state for lawsuits that the state might bring, I suppose, as the parent for the public, to abate a nuisance. So that's the scheme we have. I don't agree that it's a deposit to the state, Your Honor. They deposit it into their own escrow fund. Well, they're putting money into this account. They're putting money into the account. And a certain amount of the money has to stay there. Has to stay there for 25 years from the time they initially deposit it. Okay. So it's a condition of doing business because this particular industry might cause, would be tort actions, I suppose, by the state. It's any... Tell me what kind of lawsuits the state would bring against you. It's very broad. The term is release claims. It's defining... Yeah. Give me, for instance. Well, for instance, would be the states, the suits that the states brought in the 1990s to recover... Well, I know about those. Give me the, for instance, now. Well, if a company were to engage in a deceptive marketing practice or some kind of consumer... Okay. And you would need money to enjoin the state from the deceptive practice? Come on. The concern is that we would sue them and there wouldn't be... They'd get an injunction. And if they violated the injunction, they'd be held in contempt and you'd fine them. Correct. That might happen. I want you to tell me the damages action the state would bring that would require this money as a condition of doing business. Well, if the action... If the state brought an action that alleged that as a result of deceptive marketing or other consumer fraud... We've got the injunction. That's taken care of. It doesn't need money. Give me one that causes damages that the state would bring. Just articulate the cause of action, counsel. Your Honor, the only cause... The only cause of action... Are you telling me you can't? Well, the cause of action that I would articulate is the same one that the state's brought. Well, as far as I'm concerned, an injunction takes care of the whole thing. Your Honor, the injunction... Like the state's Federal Trade Commission Act, which allows all kinds of injunctive relief for deceptive practices. I don't know if injunctive relief would necessarily alleviate the harms that all the consumers had suffered. Tell me what kinds of damages, actions the state would bring, qua state, not for a plaintiff. I'm sorry, Your Honor. I don't know any other answer to your question aside from what I've already given. Let me ask you a question related to that. What if the deceptive practice were not discovered for many years, and in the intervening period, people incurred significant health damages as a result of relying on a deceptive advertisement? Would the state then bring a claim for damages in order to assist in the payment of the healthcare treatment for the people who had been deceived? Yes, Your Honor. I think that would be one possible action. And I think that part of the problem is twofold, that there is a lag between the time when the product is sold and when the damages are incurred, and so it is difficult to articulate ahead of time exactly what sort of damages are going to exist or what the cause of action is going to look like. I'll buy that for hospitals and all that sort of thing. Yes, Your Honor. So unless there are any more questions about healthcare costs, disability payments, whatever. Medicaid costs, yes, Your Honor. So if there are no more questions about sort of the structure of the escrow fund and the That's a fairly unique arrangement where you have an industry that is allowed to come to the state and do business. It's unique in the sense Provided they put up a nest egg so that they misbehave, the state can, and cause damage, cause the state's fisk to suffer damage, you can collect money. I understand your point in that it's unique in that other industries are not I'm not saying you can't do it. I'm just saying that that's unique. Understood, Your Honor. I think it is unique with regard to this industry, with regard to other industries, but I would note that 52 jurisdictions have a requirement like this, 46 states Oh, you could have fertilizer industries and other kinds of industry coming into the state and they manufacture something that may get in the air and cause all kinds of trouble and cause them to do the same thing. Possibly, yes. Let me ask you about the MSA, though. My understanding was, with respect to what Judge Schoflat was asking you about earlier, that one of the conditions in the MSA for the satisfaction of the participating manufacturers was that they would not be put at a competitive disadvantage to the non-participating manufacturers. Am I misunderstanding that? Or, I mean, it seemed to me like that was part of the MSA. I don't know if you're misunderstanding it, but I would put a little more detail in there. What the MSA says is that Right, so let me, before you do that, I understand that there is another aspect to it from what you've said, but is it not also the case that the MSA, in order to sort of induce the participating manufacturers to participate as a condition of that, agreed that they would not be, that states would create these escrow funds and other kinds of regulations to ensure that they were not at a competitive disadvantage to the non-participating manufacturers? I wouldn't disagree with that, but I would like to explain to, just to be absolutely clear about why, I wouldn't, I, just to make a qualification. The way that it works, it's not a general agreement to protect the PMs from losing market share. There is a specific provision in the MSA called the NPM adjustment that says that an independent auditor will determine if the PMs have lost market share as a result of the provisions of the MSA. Now, if the independent auditor determines that, then we ask whether Georgia has enacted a qualifying, an escrow statute, and whether it's enforcing that escrow statute. And if it has, then it doesn't matter how much market share the PMs have lost, and it doesn't matter what else Georgia has done to the PMs. In other words, we can write an opinion which says level playing field has nothing whatsoever to do with the scheme, nothing at all to do with it. This is an exercise in police power, where you have an industry coming into the state that may cause injury, not only to people who would have personal causes of action, and that's their problem, but cause injury to the state in terms of health care, whatever you want to say. And so that's why the money is put up. Yes, I think. And it's changed from time to time. The state, in its wisdom, the legislature, in its wisdom, decides from time to time whether there's enough money in the pot. I'm really making it simple for you. Yes, Your Honor, I think generally that's true. I now have the picture. Yes, sir. And I see that my time has expired, so I will take a seat. That's not what I grasped from the briefing, but anyway, it's a different picture. Okay. Thank you for your time. Mr. Browning, do you understand that that's the whole scheme? It has nothing to do with level playing fields? Well, Your Honor, even though I would characterize it as the Master Settlement Agreement. Oh, forget Master Settlement Agreement. Well, it is not a level playing field. Your clients aren't our party to that agreement. Well, it is the incentives of the state are to preserve the status quo. I understand that, but separately, he now says that this is just exercising the police power, and they're making an estimate, they must have a crystal ball of how much damage your product is going to cause the state. And they need a pot of gold in order to satisfy judgment. And that is... That's the state's position. And that position does not fly. They have never made claims against S&M Brands. They have never accused S&M Brands. Oh, no, but they're looking in a crystal ball, and they have estimates. And that crystal ball says everything that the states complained about against big tobacco, involved in this funding of research to mislead the public for decades, somehow applies to this fifth generation of farmers who went into producing tobacco shortly before the Master Settlement Agreement and have not engaged in any of the alleged wrongdoing that prompted the lawsuits that initially... Your argument is that the state doesn't have a basis in fact for the amount of money that they want your clients to put into the... Is that it, basically? Your Honor, I would add... Is that your speculation? It is speculation, but more importantly, when you look at the allegations of the complaint, when you look at the way everything has been structured, this is simply an arrangement for the financial benefit of the state to preserve the status quo. And that, as courts have repeatedly stated, I would point out the Second Circuit's decision in Buffalo's Teachers Foundation, a legitimate public purpose may not be simply the financial benefit of the sovereign. That is what we're talking about here. This has nothing to do with the police power. This has getting as much money into the state of Georgia as possible, and they are willing to trample constitutional rights to get there. On the police power note, we can probably take judicial notice that cigarette smoking causes, hypothetically, an injury to the state in terms of healthcare and that sort of stuff. Your Honor, there are a lot of industries that have... I know. There are steel industry, all kinds of industries. Right. If you went to Pittsburgh in the old days, you had more healthcare problems than now. And the problem here is the money that we're being asked to pay into escrow, and the reason that these investment restrictions are making us unprofitable is because they simply want to shore up the market share of the participating manufacturers, and that is not a legitimate exercise of police power. Thank you. Your Honors, I would point out very briefly with regard to our equal protection claim, that because this involves a fundamental right, it should be subject to strict... Well, don't you have to first show that you are similarly in the same position as the participating manufacturers? And it seems to me like you're not because they are paying into the settlement agreement. They're not getting any money back from it,  that you didn't mention the equal protection claim in your opening remarks, and they didn't have a chance to respond to that. Would you like for me, Judge Joe Flatt, to answer the question? We'll take it on the briefs. Okay. Thank you. The equal protection claim. Right. We do believe they are similarly situated. We believe there are constitutional violations here, and the state of Georgia has no legitimate police power that they are exercising in this case for the reasons set out in our brief. We would ask that the decision of the district court be reversed. Thank you. Thank you. You want to keep going? I don't mind. Thank you. You okay? I'm fine. Okay. Next case is...